IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-115-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

2.    MELISSA CHARRAN,

    Defendant.

## MOTION FOR VARIANT SENTENCE AND SENTENCING STATEMENT

The Defendant, Melissa Charran, respectfully files this Motion seeking a Variant Sentence and provides the following information in support of sentencing generally. In addition, undersigned counsel anticipates making additional arguments during sentencing scheduled for July 26, 2023 at 9:30 a.m.

### GENERALLY

The primary objective of any sentence imposed by a federal court shall be that the sentence is "sufficient, but not greater than necessary, to comply with the purposes set forth in subsection (2)" of 18 U.S.C § 3553(a). This Court knows well that since *United States v. Booker*, 543 U.S. 220 (2005), the range of sentencing options has been significantly broadened. *See Gall v. United States*, 552 U.S. 38 (2007) (finding a sentence outside the Guidelines to be reasonable); *Kimbrough v. United States,* 552 U.S. 85 (2007) (noting that

courts may vary from Guideline ranges based solely on policy considerations, including a disagreement with the Guidelines); *Rita v. United States*, 551 U.S. 338 (2007) (holding that a district court may consider arguments that the Guidelines sentence itself fails properly to reflect § 3553(a) considerations); *Cunningham v. California*, 549 U.S. 270 (2007) (stating that judges are no longer tied to the sentencing range indicated in the Guidelines, but are obliged only to take into account that range along with the sentencing goals Congress enumerated in 18 U.S.C. § 3553(a) of the Sentencing Reform Act); *Spears v. United States*, 129 S. Ct. 840 (2009) (district court may categorically reject the advice of a Guideline). A district court must "give respectful consideration to the Guidelines," but is permitted "to tailor the sentence in light of other statutory concerns as well." *Kimbrough*, 552 U.S. at 101 (internal quotations omitted).

The advisory sentencing guidelines are but one of several factors a court may consider in sentencing a defendant. Foremost among these factors is Section 3553 of Title 18 providing, in pertinent part, that factors a sentencing court shall consider include the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense; to afford adequate deterrence; to protect the public; to provide the defendant with needed educational training, medical care, or other correctional treatment; the kinds of sentences available; the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the sentencing guidelines; any pertinent policy statement issued by the sentencing commission; the need to avoid sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide

restitution to any victims of the offense. 18 U.S.C. § 3553(a).

When crafting "a sentence sufficient, but not greater than necessary" under the relevant statute, there are no limitations on the information a court may consider at sentencing "concerning the background, character and conduct of a person convicted of an offense." 18 U.S.C. § 3661. *See also Irizarry v. United States*, 128 S. Ct. 2198, 2203 ("there is no longer a limit ... on the variances from Guideline ranges that a District Court may find justified under the sentencing factors set forth in 18 U.S.C. § 3553(a)").

Ms. Melissa Charran appears before this Court having entered a guilty plea on June 9, 2022 to Count One of the Information [ECF. No. 70], charging a violation of Title 21, United States Code, Section 843(b) and 18 U.S.C. §2. The Government, the defense, and the US Probation Office have all reviewed the Ms. Charran's criminal history and agree that she is in Criminal History Category I. Pursuant to the Department of Probation's Sentencing Guideline Calculations, Ms. Charran's guideline sentence is 48 months, which is the maximum sentence for the above Class E Felony.

Accurate calculations of the advisory sentencing guidelines are the starting point of the sentencing analysis, but the advisory sentencing guidelines are simply that, "advisory." The guidelines are but one of the seven identified criteria the court must consider when fashioning a sufficient, but not greater than necessary sentence, pursuant to 18 U.S.C. § 3553. The following information contained in this Motion supports a sentencing variance from the advisory guideline range to a sentence or probation.

**Nature and Circumstances of the Offense** –Ms. Charran has pleaded guilty and has accepted full responsibility for her involvement in the instant offense.  As noted in the PSIR

3

(ECF. No. 70, ¶ 24), Ms. Charran agreed to the stipulated facts outlined in the Plea Agreement and the Department of Probation agrees that an adjustment for acceptance of responsibility is appropriate. Moreover, prior to entering into her plea agreement, Ms. Charran met and spoke with law enforcement agents both at the time of her arrest and also in a pre-plea proffer. At such times, Ms. Charran not only admitted her responsibility, but also provided information concerning the actions of the co-defendant, Eric Mortensen, and provided information concerning illegal marijuana operations in the Denver area as well as other individuals distributing illegal drugs through other means. Naturally, the defense will rely upon the government's determination as to the value of information provided since they are in a better position to do so. Nonetheless, Ms. Charran's actions both immediately following her arrest and months later are indicative and supportive of the contention that she has truly admitted her **culpability.**

During the proffer, which occurred on March 3, 2022, Ms. Charran provided information about the dispensaries she purchased from, the general quantities, and the people who she believed would receive the purchases (Ms. Charran wasn't privy to the identities of all the people Mr. Mortensen shipped to since Mr. Mortensen made most of the sales without first informing Ms. Charran).

Ms. Charran did not shy away from providing truthful information concerning her role in this criminal enterprise.

Moreover, soon after her arrest and release in this case, Ms. Charran returned to her apartment and discovered that law enforcement officials had, in error, left marijuana products at her residence. Ms. Charran immediately reported this to undersigned counsel and after a quick

4

call, the U.S. Attorney arranged for law enforcement to obtain the prohibited items.

The defense is not attempted to belittle or minimize the nature of Ms. Charran's conduct in this case, but as more fully described below, her role relative to Ms. Mortensen is a factor that should be considered. This consideration should not be factored in solely as it relates to the different criminal histories of the two defendants, but also as to the large disparity in their respective roles in the operation. Ms. Charran's role was to use her medical marijuana license to purchase marijuana from state dispensaries. The purchased amounts were clearly in excess of the amounts permitted by state and federal law. Mr. Mortensen then took these quantities and set up purchases from individual in different states.

While the guidelines for these charges do show extremely large potential prison sentences, the Court can take into consideration the fact that those guideline calculations may be based on incorrect assumptions as to THC purity and weight. Moreover, the defense notes that these large sentences, based on the guidelines, potentially place the distribution of marijuana at or near the levels for other drugs such as heroin, cocaine or methamphetamine. Nonetheless, the defense wishes to focus its arguments in support of a variant sentence in other areas because Ms. Charran's sentence in this case is limited to a forty-eight month prison sentence. Thus, the defense wishes to focus on a variety of other considerations, discussed below, that we contend better support a variant sentence of probation.

**History and Characteristics of Ms. Charran** - As an initial matter, Ms. Charran notes that the Probation Report filed in this case by United States Probation Officer Paige Meador is an excellent source for information regarding Mr. Charran's background. The Report contains

complete and accurate information regarding Mr. Charran's family, her life here in the United States, and her life growing up. In many ways, other than the instant case, Ms. Charran' life feels to her rather unremarkable and ordinary. For much of her life, that "ordinariness" was fine with her and she was centered on her family and working.

In preparation for this sentencing, the defense obtained the services of Nil Buckley, a Licensed Professional Counselor and Domestic Violence Evaluator and Treatment Provider in Colorado Springs. Her evaluation and report is attached hereto and her services were obtained to help the defense, and the court, to get a better sense of the relationship dynamics between Ms. Charran and Mr. Mortensen. (Report attached as Exhibit A)

Prior to meeting Mr. Mortensen, Ms. Charran was living in Minnesota while Mr. Mortensen was in Colorado. Ms. Charran had just finished a long relationship but met Mr. Mortensen through a dating app. Ms. Charran's father had known Mr. Mortensen and did not have a favorable opinion of him, an opinion that Ms. Charran soon came to regret ignoring to an extent. (Ms. Charran is conflicted in that she regrets the relationship but does not "regret" her child, Liam).

At the time their relationship began, Mr. Mortensen was not working and was selling marijuana (Ms. Charran did not notice this right at the beginning of the relationship but soon found this out) while Ms. Charran was working remotely in tech support for a company called Dispatch.

During their relationship, Mr. Mortensen focused on growing an illegal drug business, while you continued to work and seek employment at legitimate companies-Ms. Charran left Dispatch in August 2020 and found out she was pregnant in November 2020. Because Mr.

6

Mortensen had a felony record, he could not enter and purchase at Colorado marijuana dispensaries, so he would request that Ms. Charran do the purchases. Sometimes, the requests were made kindly, and at other times Mr. Mortensen would yell and demand that Ms. Charran go to the dispensaries. On one occasion, Mr. Mortensen assaulted Ms. Charran and punched her while she was pregnant because she had decided not to go to the dispensary on a particular day. The physical abuse did not stop when Ms. Charran became pregnant, and in fact, the violence increased. In January 2021, while Ms. Charran was three months pregnant, Mr. Mortensen became angry at Ms. Charran because she said she did not want to go to the dispensaries to purchase; in a rage Mr. Mortensen hew her against the bed (almost causing her to black out), and threw her out of the apartment, yelling that she "better not be there" when he return. (ECF. No. 102, ¶ 51). Ms. Charran left in a hurry, leaving her dog, and only returned a few weeks later after Mr. Mortensen "guilt tripped her" by, among other things, threatening to give Ms. Charran's dog away if she did not return. (ECF. No. 102, ¶ 51).

The report by LPC Buckley paints a picture of a toxic relationship, where Mr. Mortensen would make decisions and Ms. Charran would agree, sometimes in an effort to get his approval and love. This is not meant to excuse her conduct; Ms. Charran knew what she was doing and knew it was wrong. However, the context of her actions was that Ms. Charran, perhaps sadly, was primarily seeking love and approval. Ms. Charran was attempting to build their relationship while Mr. Mortensen was building a marijuana distribution business. Mr. Mortensen, like some other domestic violence perpetrators, controlled the finances in the house: the Bitcoin account was in his name and Ms. Charran needed to request funds from Mr. Mortensen to pay for bills or food for the house.

The toxicity on their relationship first began with verbal abuse by Mr. Mortensen, then escalated to physical abuse, leading up to occasions where Ms. Charran was grabbed and dragged if she failed to meet certain standards. As is common with certain victims of domestic violence, Ms. Charran was greatly conflicted because she loved Mr. Mortensen despite his abuse.

Post arrest, Ms. Charran has attempted to keep a relationship with Mr. Mortensen primarily because they have a child in common. Prior to her arrest in this case, Ms. Charran had learned that she was pregnant and she gave birth on August 1, 2021 to her (and Mr. Mortensen's) son, Liam. However, the relationship with Mr. Mortensen was still toxic after their arrest. Undersigned is attaching as Exhibit B a copy of a recording of a video jail call between Mr. Mortensen and Ms. Charran that occurred prior to the guilty pleas in this case. In the video, Mr. Mortensen insulted and demeaned Ms. Charran, yelling at her for trying to help Mr. Mortensen. Unfortunately, there are several similar calls between Mr. Mortensen and Ms. Charran that were contained in the discovery in this case. Undersigned counsel can represent that there are too many to include in this filing but that this video is sadly representative of many of their communications—Ms. Charran attempting to be civil, and Mr. Mortensen insulting and demeaning Ms. Charran.

The impact of Mr. Mortensen's abuse is not only reflected in the evaluation by LPC Buckley but is confirmed in the mental health assessment conducted on December 22, 2022 through the department of probation. According to this assessment, conducted by the Midwest Center for Personal and Family Development in Minnesota, Ms. Charran was diagnosed with post-traumatic stress disorder, acute. (ECF. No. 102, ¶ 60). The PTSD, and her anxiety and depression, were tied in large part to her "experience with domestic violence and emotional

8

abuse that she has experienced with Mortensen." (ECF. No. 102, ¶ 60, 61). However, Ms. Charran has also experienced trauma at the hands of a family member who attempted to sexually assault her; this same family member, it turns out, had sexually assaulted Ms. Charran's cousin and when the cousin had initially reported the abuse, members of the family originally did not believe the allegations. This history may explain why Ms. Charran was hesitant to report the abuse.

While this case involves a significant amount of marijuana that was purchased and sold, it is also clear that while Ms. Charran assisted the drug operation, the primary decisions in this matter belonged to Mr. Mortensen. Although Mr. Mortensen's sentencing guideline numbers are high, that is due in some part to his criminal record, which includes a domestic violence related felony charge from a previous relationship. Nonetheless, many of the drug-related decisions were made by Mr. Mortensen. So for example, Mr. Mortensen had the drug contacts, posted Internet videos for his sales, obtained the money, and deposited all funds into his account. Mr. Mortensen also decided the quantities that were to be purchased from the dispensaries and also decided which dispensaries to "hit" on a given day. Ms. Charran's sentence is impacted naturally by the quantities that were sold, but to some degree Mr. Mortensen decided upon those quantities.

Further, while Ms. Charran agrees that she essentially lived as a result of some of these drug proceeds, in practice she did not economically benefit to a great extent. Much of her larger purchase items (such as her BMW) were either purchased prior to her relationship with Mr. Mortensen or with her own money. In fact, half of the purchase price for the BMW came from an insurance payment to Ms. Charran. As noted above, rent and household expenses were paid

from the drug proceeds, but Ms. Charran herself not living a high lifestyle.

Since her release in this case, Ms. Charran has returned home to Minnesota, with the Court's permission, and has worked hard to return to a normal life. She was done well on supervision, although she had an admitted relapse. As she admitted to the Court on the date of her Change of Plea, this relapse coincided with her learning that the State of Colorado had opened a parallel state case charging her and Mr. Mortensen for state tax evasion. Ms. Charran entered a plea of guilty in that state case and has been on state probation ever since.

In the meantime, Ms. Charran has sought work while focusing on raising her child. Ms. Charran has obtained work offers that have been, in some cases, retracted due to her criminal record. However, Ms. Charran remains undaunted and is committed to improving her life and to that end, in January 2023, she began her own LLC (called Mama Meli's Enterprises, LLC) in Minnesota to have her own brand of paper towels. (A copy of the business formation and photos of the product are attached as Exhibit C). Ms. Charran has also been taking business courses as to how to start your own brand and has been taking a credit repair course. In addition, care for her son, Liam, who is now twenty months old, has been her focus since the inception of the case and she is hopeful that the Court would permit her the chance to continue to be supervised both in state and in this federal matter. As the Court is aware, this instant matter is Ms. Charran's the first entry into the criminal justice system and Ms. Charran is remorseful of her conduct.

Ms. Charran has also been in therapy over the past five months through pre-trial and has found the program to be extremely beneficial.

## CONCLUSION

Ms. Melissa Charran appears before this Court at 29 years of age. Prior to this case she had never been arrested before for any crime whether here in the United States or in any other country. Ms. Charran was arrested on March 26, 2021 and, with the exception of the single positive UA in 2022, has been a model defendant on probation. Undersigned counsel thus respectfully submits that a variant sentence of probation would be sufficient, but not greater than necessary, to achieve the purposes of sentencing as set out in 18 U.S.C. § 3553(a)(2).

Dated:  July 12, 2023

                                      Respectfully submitted,

                                      ANDRES R. GUEVARA
                                      Law Office of Andres R. Guevara


                                      <u>s/ Andres R. Guevara</u>
                                      ANDRES R. GUEVARA
                                      Law Office of Andres R. Guevara
                                      2806 N. Speer Blvd
                                      Denver, CO 80211
                                      Telephone:  (720) 379-8262
                                      FAX: (720) 699-6808
                                      E-mail:andres@guevaracoloradolaw.com
                                      Attorney for Melissa Charran

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on July 12, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all attorneys authorized to receive service

s/ Andres R. Guevara
ANDRES R. GUEVARA
Law Office of Andres R. Guevara
2806 N. Speer Blvd
Denver, CO 80211
Telephone: (720) 379-8262
FAX: (720) 699-6808
E-mail:andres@guevaracoloradolaw.com
Attorney for Melissa Charran