# EXHIBIT A

"Victim Assessment of Ms. Charran" and Resume of Nil Buckley



# VIVUS COUNSELING
### SERVICES

6290 Lehman Dr. Ste 150
Colorado Springs. CO. 80918
719-755-0130 – Referral
719-312-6999 – Fax
www.vivuscounseling.com

VICTIM ASSESSMENT OF MS. CHARRAN

## Evaluator Professional Background

I am a Licensed Professional Counselor and Licensed Addiction Counselor practicing in El Paso County, Colorado. I am approved by the Colorado Domestic Violence Offender Management Board as a Full Operating Level Pre-Plea & Post Sentence DV Evaluator and Treatment Provider. I have a master's degree in Clinical Mental Health Counseling from the University of Colorado with an Emphasis in Substance Use Disorders (addictions) and a bachelor's degree in Psychology. I specialize in Personality Disorders, and I am certified in Advanced Diagnosis, Treatment and Management of Personality Disorders. I am further Certified in the HARE Psychopathy Checklist' one of the most widely used instrument in the psychiatric assessment of psychopathy.

I began my professional career almost a decade ago. Over the past 9 years I have worked in community mental health, in a private and public setting. I have worked directly with the Forensic Population since 2015. Currently, my scope of practice is heavily focused on Evaluating and treating court-ordered, and non-court-ordered clients. I am trained in multiple Risk Assessments which calculates/predicts the risk of future recidivism, as well, Offender and Victim Dynamics. Additionally, I treat individuals with co-occurring disorders including Veterans, Victims of Domestic Violence, and individuals involved with the criminal justice system due to child abuse and neglect cases.

**Client's Name:** Melissa Charran
**Client's Date of Birth:** 05/05/1990
**Assessment Date:** 04/25/2022
**Attorney's Name:** Andres Guevarra
**Evaluator's Name:** Nil Buckley, MA, LPC, LAC, NCC
CO DVOMB Approved Evaluator/DV Expert

### Source of Referral & Reason for Assessment:
Ms. Charran was referred to this Evaluator by her Attorney, Mr. Andres Guevara, to engage in a Victim Assessment. The referring source notes that Ms. Charran has made reports that she was a victim of abuse and coercion during her relationship with her co-defendant. This Assessment aims to identify what forms of abuse Ms. Charran experienced in her relationship with her co-defendant. To make this determination, Ms. Charran was Evaluated for approximately 3 hours, and she was administered multiple assessments described below.

### Assessments/Methods Utilized:
- The Danger Assessment (DA)
- The Mosaic Threat Assessment (MOSAIC)
- The Minnesota Multiphasic Personality Inventory (MMPI)
- Clinical Interview

### Additional Collateral Information Reviewed:
- Multiple videos of Mr. Mortensen leaving Ms. Charran a voicemail from jail

### Psychosocial History:
Ms. Charran was born and raised in Guyana, South America. She reports being raised by both parents and noted that her parents have been married for at least 30 years. Ms. Charran has one brother whom she reports being very close with. She acknowledged growing up in a stable and nurturing environment. She denied witnessing any forms of abuse in her household and overall described her childhood as "happy"

### History of Adverse Childhood Experiences:
"Ms. Charran reports that at age 17 her uncle tried to assault her sexually. She screamed and ran into her bedroom. She shared that her parents arrived shortly after, and her father confronted her uncle but he said he was trying "to scare me." She noted that they "basically moved out and never talked about it again." She further shared that later on, her family found out that her uncle had molested his own daughter and when her cousin attempted to report, "no one believed her"

Ms. Charran denied any other forms of abuse levied against her

### Education and Employment:
Ms. Charran graduated High School in 2011

Ms. Charran was last employed this year. She was working as a logistic coordinator and left because "it was not steady hours or paycheck." She reports that she is currently looking for employment and something more stable. She was interviewed last week, and she is also currently studying to become a realtor

### Legal History:
Ms. Charran denied any previous history of arrests as an adult or juvenile. Ms. Charran is indicted on charges of possession and distribution of a Scheduled I Controlled Substance.

### Relationship History:
Eric – Ms. Charran reports meeting Eric via a dating app called bumble in November of 2019. At the time they met she was living in Minnesota. Ms. Charran reports that they started a long-distance relationship, and she would often fly to Colorado and stay with Eric for weeks at a time. Ms. Charran was asked by this

Evaluator to describe the beginning of her relationship with Eric, and she stated the following: "He had asked me out and I don't usually introduce someone to my parents right away. He was staying in a hotel because his home had broken into. Later on, I heard a conversation between him, and the police and I asked him what was taken, and he said "valuable stuff, like marijuana" I didn't know in the beginning that he dealt out of his house. He was polite and nice and kind. I had just gotten out of a 7-year relationship. I was hopeful about dating life. After the third meeting he picked me up. My father recognized his vehicle from a previous place of work. I showed my dad a pic and he recognized him. My father knew him to be hot headed and I ignored that. It took about 5 months for me to see his hotheaded side. It started with when I would try to walk away, he started grabbing me, but it escalated to grabbing me and dragging me into the bedroom. It didn't get worse until months later when we started living together. About 2 months later his behaviors began escalating. I can't even remember but I began to feel in my gut and to become suspicious. Whenever I asked him, he would call me dumb and insecure and would put me down. I didn't have proof of anything. This went on for a while. I only had suspicious"

History of Coercion:
Ms. Charran was asked to expand on her relationship dynamics with Eric prior to her arrest. She noted the following: "Long story short, when I moved from MN, he gave me login to his emails. He had me lookout a court date that was approaching. I had never seen his email before. As I am scrolling down, I see all these dating apps. I saw that he was on multiple apps, and he was talking to multiple people. All I ever wanted was his love and I only got it if I did something for him, like going to a dispensary. God, forbid I made a mistake, I would be ridiculed. It took me a while to have a conversation with him about his behaviors and to say we can't carry on like this. Then I got pregnant and there was no leaving him once I was pregnant. I had left before after he hit me when I was pregnant, and he said I had better be back when he got back. Once while pregnant and he threatened to punch my stomach (client begins crying)

Ms. Charran was asked by this Evaluator to explain why she felt she could not leave while pregnant. She stated, "it's not the culture I grew up in, we are very family oriented. I hoped that we could build a family together"

Post Incarceration Abuse:
Ms. Charran reports that Eric calls often and wants to discuss details of the case. She noted, "Basically, I ended up answering his call last night and he was questioning me about where I was, and I told him that I was in CO, and he started bashing my lawyer. I have disabled his calls. At first, I felt guilty not taking his calls because we have a son together, but I blocked him anyways."

Randy – Ms. Charran met Randy when she was 18 years old. She reports that Randy was her first boyfriend, and she grew up very strict parents who did not allow her to date until she turned 18. She reports that they were together for 7 years and she broke up with him because she found messages between him and another person. She reports that Randy was "jealous and obsessive but not physically abusive" toward her. She noted, "it was the complete opposite of my relationship with Eric. I was free to do whatever I wanted. He never prevented me from leaving. He never called me names or swore at me."

Mental Health History:
Ms. Charran denied any significant history of mental health diagnosis. She currently presents with some symptoms of anxiety and depression. She presents with low self-esteem and a history of suicidal ideation. She denies any plans to hurt herself or others and she is willing to engage in therapy.

Power and Control Tactics:

"In order to fully understand and appreciate the trauma that battered women endure it is vital to look…to the coercive control tactics through which they are manipulated. The clinical profile of a battered woman reflects the fact that they have been subjected to an ongoing strategy of intimidation, isolation and control that extends to all areas of a woman's life" (Strauss, 1993).

- Using Intimidation:
  - "Breaking my phone, throwing my food away"
- Using Emotional Abuse:
  - "Calling me a cunt, dumb motherfucker (he would scream this on my face), calling me a bitch, stupid bitch, lazy"
- Using Isolation:
  - "Once I tried getting a med badge to work at a dispensary and he shut me down saying, I already had a job. I didn't know many people in CO and anytime I tried making friends he prevented me from doing so"
- Minimizing, Denying and Blaming:
  - "A month ago, I mentioned that my doctor recommended therapy to me, when I brought it up, he was like, why would you do that? Whenever I told him he was the reason I am going through this, he minimized and told me I was crazy"
- Using Children:
  - "When he would blow up my phone and I refused to talk to him, he would talk to the baby about me, like, "your mom is being difficult""
- Using Male Privilege:
  - "He always says, you should listen to your man, I am the man of the house. Once I bought my parents tickets with my own money and he got so mad at me because I did not consult with him. I was 5 months pregnant and I standing on the stools, and he acted like he was going to push me off the stool if I didn't acknowledge and say, yes, I understand"
- Using Financial Abuse:
  - "He would give me an allowance to buy groceries and run house"
  - "I used to work for a tech company and once I quit that job, I had to ask him for money"
  - Client reports she has never shared a bank account with him
  - Client reports he had access to her bank account and often, at least once a month, he logged into her bank account through her phone
- Using Coercion or Threats:
  - "Whenever I don't take his calls now, he will say, I will see you in however long, bitch". Making me buy more weed than I wanted to so he could sell it. If I didn't or said no, it would lead up to an argument or him hitting me."

## Post-Separation Abuse:

- Using Physical and Sexual Violence Against & Children:
  - "Threat to displace my dog"
  - "Threat to destroy the apartment"
  - "Physically hurt me when I got back to him"

- Discrediting Her as Mother:
  - "He says I don't care about our son"

- "He will say things like, I need to see my son"

### Lethality and Risk:
Ms. Charran acknowledged the history of one lethal risk factor in her relationship with Eric: strangulation. She reports that once "he wanted her to stop talking" and he strangled her. She recalls having nails indentations in her neck and shared that once Eric realized that he had left marks in her neck, he cut his nails. She recalls having a mild loss of vision during this incident.

### Administered Assessments and Psychological Testing:

**The Danger Assessment (DA):** was originally developed by Co-Investigator Campbell (1986) with consultation and content validity support from battered women, shelter workers, law enforcement officials, and other clinical experts on battering. The Danger Assessment helps to determine the level of danger an abused woman has of being killed by her intimate partner.

On the PCL – She reports joining a DV Survivor Group for support. Reports these symptoms have increased since having her son. Reports she feels alone having to do all of these alone
"Maybe if I didn't exist none of this would have happened-said this in January to her parents"
"My mom said once maybe if you hadn't
I just loved him, I didn't care for materialistic things, I never asked him to buy me things. Every night I ask myself, are you really crazy, is that what you really want. I am torn. I feel like I am strong enough to walk away"
When I broke up with my ex, I was able to cut off contact and he never pursuit
I feel guilty to not continue contact with eric because we have a kid, and he is always there
He calls me daily

### Mosaic Threat Assessment:
**ASSESSMENT RESULTS: 7 on a scale of 1 to 10**
Based upon the information you have provided, and with a quality level of 161 out of a possible 200, this situation appears most similar to cases that -have- worsened and escalated. On a scale of 1 to 10 (10 being assigned to the worst situations), this situation is a 7. Some similar cases have escalated to include worsening abuse, substantial violence, and even homicide. This situation definitely carries a high risk for M, and steps to enhance safety and wellbeing are called for.

### Children in the environment:
The youngest child in the environment who could be affected by inappropriate behavior is under 4 years old. Studies show that children do not sleep through the violence. They hear it, they see it and, all too often, someday they feel it, either on purpose or by accident. Little boys learn to hit, little girls learn to accept being hit.

**QUALITY OF THIS ASSESSMENT: 161 out of a possible 200**

**The Danger Assessment (DA):** was originally developed by Co-Investigator Campbell (1986) with consultation and content validity support from battered women, shelter workers, law enforcement officials, and other clinical experts on battering. The Danger Assessment helps to determine the level of danger an abused woman has of being killed by her intimate partner.

<u>Has he avoided being arrested for domestic violence?</u> "Yes, once I called the cops, he grabbed my phone and thew it at the wall and smashed it"

<u>Does he ever try to choke/strangle you or cut off your breathing?</u> "He strangled me once and left nail indentations on my neck. When he saw the nails marks, he started cutting his nails." Client reports she recalls having a hard time breathing and remembers seeing "dark circles" which is common sign of strangulation and associated with the loss of oxygen.

<u>Does he use illegal drugs?</u> By drugs, I mean "uppers" or amphetamines, "meth", speed, angel dust, cocaine, "crack", street drugs or mixtures. "Yes, methamphetamine"

<u>Does he control most or all of your daily activities? For instance, does he tell you who you can be friends with, when you can see your family, how much money you can use, or when you can take the car?</u> (If he tries, but you do not let him, check here: "Yes"

<u>Have you ever been beaten by him while you were pregnant?</u> (If you have never been pregnant by him, check here: __) "Yes"

<u>Have you ever threatened or tried to commit suicide?</u> "Yes, with sleeping pills"

**Adverse Childhood Questionnaire (ACE)**: An ACE score is a tally of different types of abuse, neglect, and other hallmarks of a rough childhood. According to the Adverse Childhood Experiences study, the rougher your childhood, the higher your score is likely to be and the higher your risk for later health problems.

Ms. Charran acknowledged minimal history of Adverse Childhood Experiences. She scored three out of ten on the ACES questionnaire.

**Minnesota Multiphasic Personality Inventory 2 Restructured Form – MMPI 2 rf:** The MMPI-2-RF, the latest revision to the Minnesota Multiphasic Personality Inventory, is one of the most widely researched and used psychological assessment instruments. The MMPI-2-RF conceptualizes personality and psychopathology as a hierarchical arrangement of relatively narrow, focused, dimensional constructs. By comprehensively measuring 50–60 clinically relevant characteristics to describe the individual, the MMPI-2-RF both reflects and contributes to a historic paradigm shift in terms of how personalities and psychopathologies are rendered: Rather than trying to fit Ms. Charran into specific diagnostic categories or label them with disorders, the MMPI-2-RF describes the individual as clearly and coherently as possible.

Ms. Charran scores on the MMPI-2-RF validity scales raise concerns about the possible impact of over-reporting on the validity of this protocol. With that caution noted, scores on the substantive scales indicate somatic complaints and emotional, thought, behavioral, and interpersonal dysfunction. Somatic complaints include preoccupation with poor health, malaise, head pain, neurological symptoms, and gastrointestinal problems. Emotional-internalizing findings include suicidal ideation, demoralization, self-doubt, stress and worry, anxiety, and fears. Dysfunctional thinking includes ideas of persecution and aberrant perceptions and thoughts. Behavioral-externalizing problems relate to excessive activation. Interpersonal difficulties relate to cynicism.

**Clinical Summary:**
Ms. Charran is a 31-year-old, Single Female, Evaluated on April 25th, 2022. She was interviewed for over three hours at my office located at 6290 Lehman Dr, in Colorado Spring, CO. Ms. Charran is currently living

in Minnesota however she flew to Colorado Springs for this Assessment Interview. Ms. Charran was cooperative and forthcoming with this interview process and all administered assessments.

Ms. Charran presented with genuine clinical presentation associated with true victims of intimate partner violence. As she recounted her relationship trajectory with Eric she would often pause and cry, particularly as she recalled undergoing abuse while pregnant with Eric's child. There is much evidence to suggest that Ms. Charran underwent various forms of abuse by Eric and that she continues to undergo various forms of abuse and threats <u>even while he is incarcerated</u>. The forms of abuse and power and control tactics Ms. Charran has experienced are described earlier in this Assessment. It includes but it is not limited to verbal abuse, emotional abuse, psychological abuse (threats), coercion and physical abuse. This Evaluator reviewed multiple videos of Eric leaving Ms. Charran voice messages. In these videos, he is seen threatening Ms. Charran and calling her very degrading names such as "stupid little whore, stupid little bitch". He is further heard telling Ms. Charran "To go kill herself" and it's explicit that he is upset with her for not answering his phone calls or sharing details about the case. Ms. Charran did disclose a history of suicidal ideation during this assessment but denied having any plans to hurt herself. Ms. Charran does present with low self-esteem and symptoms of both depression and anxiety. Depression, Anxiety, and Low-Self-Esteem have been linked to the effects of intimate partner violence on victims.

Further, Ms. Charran discloses of a pattern of wanting to please Eric. This likely contributed to her decision-making process which ultimately led to her arrest. It is important to note that Ms. Charran does not present with a Procriminal attitude nor antisocial traits which are the most predominant risk factors associated with individuals who willingly commit crimes or have antisocial personality disorder.

Through appropriate psychotherapy and a healthy support system, Ms. Charran can increase her view of self, others, and the world and ultimately learn to engage in healthier relationships. It is this Evaluator professional opinion that once again, Ms. Charran was/is a victim of abuse in her relationship with co-defendant Eric. She presents with a need to improve her ability to make healthier decisions when it comes to intimate relationships which includes setting boundaries and identifying red flags associated with the cycle of violence

Recommendations/Conclusion:

- Ms. Charran would benefit from engaging in individual therapy and addressing her mental health concerns/needs
    - It is recommended that Ms. Charran focus on further addressing her history of victimization as to increase her ability to identify red flags associated with unhealthy/abusive relationship and to decrease her chances of future victimization or recidivism
- This Evaluator does not find that Ms. Charran presents with personality traits associated with Antisocial Personality Disorder or Pro Criminal Attitudes and Belief Systems which further condones crime and disregard for authority
- Ms. Charran's desire "to please Eric" and her pregnancy likely led to her inability to engage in healthy decision making and contributed to her maladaptive behaviors while in a relationship with her co-defendant

<u>Possible Targets for Treatment</u>
- Psychological distress as an initial target
- Pain management for head pain complaints
- Stress reduction for gastrointestinal complaints if stress-related

- Low self-esteem and other manifestations of self-doubt
- Stress management and excessive worry and rumination
- Dysfunctional negative emotions
- Anxiety
- Behavior-restricting fears
- Persecutory ideation
- Lack of interpersonal trust

Sincerely,
Signed electronically Nil Buckley, MA, LPC, LAC, NCC
Licensed Professional Counselor, License #001471
Licensed Addiction Counselor, License #000874
CO DVOMB Approved
Pre-Plea Evaluator/DV Expert

**NIL BUCKLEY**
6290 Lehman Dr, Suite 150
Phone: (719) 359-3431
nbuckley@vivuscounseling.com

---

**PROFESSIONAL SUMMARY:**
I am a Licensed Professional Counselor, Licensed Addiction and a Full Operating Level Pre-Plea and Post-Sentence Domestic Violence Evaluator and Treatment Provider. I have a master's degree in Clinical Mental Health Counseling from the University of Colorado and a Bachelor's Degree in Psychology. I began my professional ten years ago. I am an expert at assessing, evaluating, and treating Domestic Violence Offenders and Victims of Domestic Violence. I am trained in multiple Risk Assessments which calculates the risk of future recidivism for offenders, as well, the risks associated with decreasing and increasing victim safety. Additionally, I treat individuals with co-occurring disorders including Veterans, Victims of Domestic Violence, and individuals involved with the criminal justice system due to child abuse and neglect cases.

*EDUCATION*

University of Colorado at Colorado Springs
Master of Arts in Clinical Mental Health Counseling- Addiction Emphasis

University of Phoenix
Bachelor of Science in Psychology

State University of Maranhao – Brazil - 2004-2007
Teaching License in Languages – Major in Portuguese and English Language

*LICENSES*

Licensed Addiction Counselor
LAC #0000874
Expires: 08/31/2019

License Professional Counselor
LPC: 0014711
Expires: 8/31/2019

Colorado State Approved Domestic Violence Provider
Full Operating Level
Granted: 2018

*LANGUAGES*

Proficient in English, Spanish and Portuguese

*RELATED EXPERIENCE*

**Vivus Counseling Services, LLC – Executive Director/Clinician**
**August 2018- Present**

- Conduct group counseling for male perpetrators of domestic violence in the state of Colorado
- Administer and interpret Domestic Violence Evaluations for male offenders to identify offender's needs and level of treatment
- Administer and interpret Mental Health Evaluations for Forensic populations involved with the Department of Human Services and Probation
- Administer and interpret Domestic Violence Custody Battle Evaluations for male/females
- Administer and interpret Substance Abuse evaluation to identify client's needs, level of treatment and presence of co-occurring disorders
- Provide mental health services for individuals diagnosed with Co-Occurring disorders
- Provide individual therapy for offenders struggling with mental health illnesses, substance abuse disorders and personality disorders.

**Colorado Department of Corrections/Mental Health D&A Clinician**
**May 2017 – October 2018**

- Provide mental health services for offenders diagnosed with Co-Occurring disorders
- Review records and interview offenders in person or through televideo conferencing to assess crises, develop interventions, document contacts and write orders.

- Conduct group and individual therapy.
- Provide continuity of care by briefing facility staff on crises and interventions provided during the weekend.
- Conduct infirmary and mental health watch rounds.
- Document assessment and treatment interventions.
- Complete and document IBAAP screenings, Suicide Risk Assessment, transition forms and transition procedures.
- Assist Diagnostic Unit in the scoring of assessments to identify offender's criminogenic needs and make recommendations for the facility's Residential Treatment Program

**Savio House/Bilingual Therapist**                             **Mar 15-May 17**
**FTDC – Family Treatment Drug Court**

- Conduct intake of patients and develop initial treatment plan
- Submit treatment plan to the 4th judicial presiding magistrate
- Administer regular drug tests and arrange for counseling sessions
- Review clients' records to assess treatment programs
- Maintain records of treatment and progress in a state database (Trails)
- Develop individualized treatment plan for court ordered and incarcerated clients
- Attend professional staffing and weekly court hearings

**Home Based Intervention – HBI - Child Protection Unit**

- Providing home based intervention and family counseling in partnership with the Department of Human Services (DHS) and Family Treatment Drug Court (FTDC)
- Participating in Treatment Support Meetings and Team Discussion Meetings
- Facilitating a therapy group for the children of households involved in domestic violence and substance abuse cases.
- Providing Treatment Plans, Safety Plans in Spanish to accommodate client's needs

**Certified SafeCare Provider/Coach**

- Conduct and observe parental knowledge and skills for each module by using a set of observation checklists.
- Encouraging and assessing the parent in practicing taught skills
- Providing positive and corrective feedback to the parent to promote skill acquisition
- Working with parents until they meet a set of skill-based criteria that are established for each module.
- Provide coaching to SafeCare Home Visitors as required for certification and to
- maintain high fidelity to the SafeCare model
- Give honest and open feedback to home visitors with the goal of model fidelity in mind
- Provide high fidelity implementation of SafeCare model for assigned cases

**AWARDS/RECOGNITIONS**

- NAADAC Minority Fellowship Program -NMFP (First Cohort winner)
- NAADAC Fellow of the Month (June 2018)
- DV Summit Porch Light Award (2019)
- Expert Witness
    - Domestic Violence Evaluation/Treatment
    - Substance Abuse Evaluation/Treatment
    - Mental Health Counselor